MURRAY NELSON ET AL.

v.

ARTHUR C. McINTYRE.

1.   REPLEVIN—QUESTION AT ISSUE.—The question in replevin is whether the property in controversy belongs to the plaintiffs, and hence, in an action of replevin for grain in warehouses, levied upon as the property of the defendants, there is no objection to the defendants being permitted to prove that there was grain in both warehouses belonging to other parties.

2.   WAREHOUSE RECEIPTS—TRANSFER OF TITLE BY.—Where the evidence showed that grain had been delivered from the warehouse, and the warehouse receipts surrendered to the warehousemen, an instruction to the effect that if the jury believe from the evidence that the warehouse receipts in evidence were not held by the plaintiffs at the time of the levy of the execution offered

in evidence, but had been surrendered to the warehousemen prior to that time, then the plaintiffs are not entitled to any of the property replevied by reason of their once having held such receipts, is erroneous. If the real reason of the surrender was the delivery to plaintiffs of the grain mentioned in them, then they were most certainly entitled to the delivered grain because they had once held the receipts and had surrendered them for grain delivered in exchange therefor.

APPEAL from the Circuit Court of LaSalle county; the Hon. JOSIAH McROBERTS, Judge, presiding.

Mr. CHARLES BLANCHARD, for appellants; that warehouse receipts are negotiable, cited Rev. Stat. 1874, 820, §§ 104, 118, 119; Burton v. Curyea, 40 Ill. 326.

That such receipts vest in the holder the absolute title to the property mentioned therein: Chicago Dock Co. v. Foster, 48 Ill. 510; Cool et al. v. Phillips et al. 66 Ill. 217; Broadwell v. Howard, 77 Ill. 305; Cochran et al. v. Riffy et al. 6 Cent. Law Jour. 88.

Messrs. MAYO & WIDMER, for appellee; that the agreement in evidence was an executory contract, creating no lien, and passing no title to the property as against creditors whose rights accrued prior to appellant's possession, cited Hunt v. Bullock et al. 23 Ill. 320; Titus et al. v. Mabee et al. 25 Ill. 257.

That it was competent for defendant to prove there was grain in the warehouse belonging to third parties: Reynolds v. McCormick, 62 Ill. 412; Constantine v. Foster, 57 Ill. 36.

SIBLEY, P. J.    James G. Wilson recovered judgment against Elias Richardson and William N. Richardson. McIntyre, as sheriff of LaSalle, levied an execution issued on this judgment, on grain in a warehouse at Ottawa, and in one at Streator; the officer received the execution on the 23d of Oct. 1875, made the levy on the 25th. Appellants brought replevin against appellee for the grain in both warehouses. On a trial in LaSalle county, there was a verdict and judgment thereon for defendant. Defendants in execution were engaged as partners in buying, storing and shipping grain at Ottawa and

Streator, under the firm name of E. Richardson & Son.   Appellants were carrying on in Chicago a general commission and grain business; they made advances of money to Richardson & Son, and received from time to time consignments of grain, sold the same on commission, and remitted proceeds by accepting and paying drafts, etc.   On the 22nd of June, 1875, Pickering, one of the appellants, went to Ottawa.   Owing to losses sustained by Richardson & Son, they had become somewhat considerably indebted to appellants, and the latter as a matter of precaution, entered into an agreement in writing as follows, viz:

"Articles of agreement made and entered into the twenty-second day of June, A. D. 1875, between Elias Richardson and William N. Richardson, as the co-partnership firm of E. Richardson & Son, parties of the first part, and Murray Nelson, E. B. Stevens and A. H. Pickering as the co-partnership of Murray, Nelson & Co., parties of the second part, witnesseth, that whereas, the said party of the first part are now indebted unto the parties of the second part in the sum of twelve hundred and fifty dollars, for money advanced and paid to and for the use and benefit of the parties of the first part, and whereas, the parties of the first and second part are still dealing together, and the parties of the first part are buying grain, and shipping the same as grain dealers; and to enable them to do so, the parties of the second part propose to make further advances, and to provide for the security of the parties of the second part for the payment of the money now not only due for advances made as aforesaid, but for such as may prove to be due upon transactions now and hereafter pending, this agreement is made, and which is as follows:"

"That the parties of the first part agree to employ, as clerk and book-keeper, Barclay H. Dorland, so far as the business carried on in the city of Ottawa is concerned; and that the said Dorland shall receive all moneys to be paid in to said parties of the first part upon the schedule of amounts hereto attached as being money due them, as also all money paid as further advances by said parties of the second part, as above mentioned and contemplated, so far as the said Ottawa business

is concerned; and that he shall have the exclusive keeping of books of accounts of said firm, and to make all entries therein, and to furnish to said parties of the second part a statement of such business whenever called upon by them so to do. The parties of the first part agree to ship the grain purchased in their Ottawa business to the parties of the second part, to be by them sold on account of advances, and for the purpose of settling up and adjusting the indebtedness aforesaid; and the parties of the second part agree to continue to make such further advances as shall enable the said parties of the first part to carry on their said business so long as they shall faithfully comply with this agreement, or until the matters in the agreement shall be disposed of by the parties hereto. Nevertheless, all of the undertakings of the parties hereto are to cease and determine, at the option of the parties of the second part, on the first day of December next; and it is understood that the chattel mortgage of this date given by the parties of the first part to the parties of the second part, of certain goods and chattels belonging to said E. Richardson & Son, as the mortgage given by said Elias Richardson of even date hereof, to said parties of the second part, upon lots ten and twelve, of block eighty-one of State's addition to the town, now city of Ottawa, in the county of LaSalle, and State of Illinois, and out-lot four, in the county addition to out-lots in the city of Ottawa, constitute and form part of the transaction contemplated by this agreement, and the indebtedness named in said mortgages is the same in this contract named, and whatever indebtedness shall be found to be due the said parties of the second part, from the parties of the first part, on the first day of December next, shall be construed to be the sum secured by said mortgages, and it is understood that the parties of the the first part, shall not be required to pay the said Dorland for his wages any more than fifty dollars per month, and that the expenses of conducting said business may be paid out of the funds of the business, including the money represented in the accounts hereto attached, as being assigned to the parties of the second part; and besides, the parties of the first part have assigned a note executed by James Donagh, for

one hundred and fifty dollars, and payable to said parties of the first part, with ten per cent. interest, in one year from the date thereof, to wit: the 15th day of April, 1875. It is distinctly understood that the said Dorland is to have no voice in the management of the business of said parties of the first part than as has been mentioned in the preceding part of this agreement. It is understood that the securities given this day as above mentioned, and the indebtednes to be determined on the first day of December next, relate to, and all of the provisions of this agreement relate to the said Ottawa business exclusively. And when the indebtedness named and contemplated in this agreement shall be fully paid, all securities and collaterals shall be returned and re-assigned, or otherwise adjusted as may be necessary.

Witness the hands and seals of the parties the day and year first above written.

ELIAS RICHARDSON.    [Seal.]
WM. N. RICHARDSON.    [Seal.]
MURRAY NELSON.    [Seal.]
E. B. STEVENS.    [Seal.]
A. H. PICKERING.    [Seal.]"

Dorland, in pursuance of said contract, went to Ottawa and entered upon his duties under it, and acted as clerk and book-keeper for Richardson & Son, and as observer of passing events for Murray, Nelson & Co., for about four months. The business was carried on in the name of Richardson & Son, after the agreement of June 22d, 1875, in the same way as before; checks were drawn and receipts given to farmers in the name of E. Richardson & Son. Dorland, in his evidence, first said that the drafts on Murray, Nelson & Co. were signed "E. Richardson & Son, per Dorland." He afterwards corrected himself, and said he signed some checks in this way. As to the outside world, the business of E. Richardson & Son in the warehouse at Ottawa continued the same while Dorland acted as clerk and observer under the contract as before.

There was no exception taken to the action of the jury in the reasons filed in favor of the motion for a new trial; nor is it assigned for error that the verdict was not sustained by the

evidence. Errors of the court only are complained of. In relation to the grain in the warehouse at Ottawa, the following points are made:

It is claimed that the fourth instruction asked by appellants should have been given because there was some evidence by Ruger, the deputy sheriff, that Dorland, as the agent of appellants, had taken possession of the grain in the Ottawa warehouse for appellants. We have examined Ruger's evidence carefully, and we find nothing in it except that he had an impression of that kind from something he had heard, but had no knowledge on the subject. Dorland, in his evidence, makes no such claim, and there is really no such evidence in the record.

It is not seriously contended by appellants in this Court that the grain actually in possession of Richardson & Son was not liable to be taken on execution against them, merely because of their relations with appellants under the agreement in writing of June 22d, 1875, though appellants may have deemed and called it their grain. And it seems to us that *that* is one of those questions which is too plain for discussion in this State.

The fourth instruction is not based upon evidence of any other possession, or transfer of possession, than that which results from the written agreement itself; but if it were so claimed, we think it was properly refused, because there was really no evidence tending to show delivery by Richardson & Son, and actual possession by appellants.

The foregoing answers the exceptions taken to defendant's first given instruction, also to the third. In the third the expression " while it remained in the possession of the Richardsons," would have been objectionable if there were a conflict of evidence as an assumption. The expression then should have been " if the jury believe from the evidence " in lieu of the word "while."

The excluded evidence of Ravens, that checks drawn upon the Exchange Bank, were signed E. Richardson & Son, by Dorland, and that the latter told witness not to honor any unless thus signed, seems to us entirely immaterial.

Dorland was there for appellants, merely as an observer of the way business was done with the money furnished by appellants, because of the relations of debtor and creditor existing between the parties to the agreement, and for the protection of appellants in that relation, as a sort of monitor and watcher of the funds.

We perceive no objection to the defendant below being permitted to prove that there was grain in both warehouses belonging to other parties. The question in replevin is whether the property in controversy belongs to the plaintiffs, and if it belongs to somebody else it does not to plaintiffs.

It is not generally considered improper to ask the question, " who was the owner of the property?" though the answer may be a conclusion of fact. Pickering however, though the court sustained an objection by defendant to the question, stated fully all the facts which created such conclusions. Though the objection was sustained, the question was really fully answered, and therefore no harm was done. As far as the Ottawa grain is concerned, we perceive no erroneous ruling.

As to the Streator grain, there was a conflict of evidence as to whether it was or was not actually delivered to appellants before the execution went into the hands of the officer.

Pickering testifies positively that the grain in the warehouse at Streator was, before this, the property of appellants, and he states his means of knowledge thus:

There had been introduced in evidence a number of warehouse receipts, given by Richardson & Son to appellants, for grain in store at Streator.

In relation to those receipts and the grain therein mentioned, this witness said: I went to Streator, taking the receipts with me, and called upon William N. Richardson. I told Richardson I had been sent there to have what grain we held receipts for shipped. He said he was ready to ship any time he got cars. We figured up the amount of grain in the warehouse. I gave him the receipts. He said he would ship the grain right out. We went and got what cars we could and loaded two of them. The grain called for by the receipts and in the warehouse was about even. I surrendered the receipts to him

39

myself after we estimated the quantity of grain in the warehouse. This was between the 20th and 24th of October. I think the 20th. I was there Thursday, Friday and Saturday. I telegraphed to Chicago for more cars. I think we got four more cars, and all were filled while I was there, with oats, corn and a little seed. The sheriff closed the warehouse before the grain was all out. The loaded cars had been billed and consigned to Murray Nelson & Co., and taken from the side track by the railroad company. The receipts he had called for more grain than there was in the warehouse. The result was, we figured up that he had so much grain on hand, then we figured up the receipts, and the receipts called for more grain than there was in the warehouse. The only examination we made was for the purpose of ascertaining whether there was enough grain in the warehouse to fill certain receipts which had not been filled. I went over the warehouse and looked at the grain. I took Mr. Richardson's book and figures for the amount of the grain. I did not estimate it.

With the foregoing evidence in the case, the Court at the request of the defendant, gave the following instruction to the jury: "If the jury believe from the evidence, that the warehouse receipts in evidence were not held by the plaintiff at the time of the levy of the execution offered in evidence, but had been surrendered to the Richardsons prior to that time, then the plaintiffs are not entitled to any of the property replevied by reason of their having once held such receipts." This instruction, when applied to the evidence tending to show that the receipts were surrendered because of the delivery of the grain in the warehouse mentioned in them, is clearly erroneous. If this was the real reason for the surrender, then the appellants were most certainly entitled to the delivered grain for the very reason that they had once held the receipts, and that they had surrendered them for the grain thus delivered in exchange for them. It may be said that the jury were properly instructed on this subject in appellant's sixth instruction. We think this sixth instruction was right, but appellee's 8th comes in direct conflict with it. Which shall the jury take? Would they not, if there be such conflict between two given

instructions, consider the one last given as to be preferred because it expressed the latest intention of the law-giver, and as repealing or annulling the prior one.

It may be that the result would have been the same if defendant had not asked, nor the court given the defendant's eighth, but we cannot so say. If the instruction was wrong, and might have done harm, we must reverse for the giving of it.

Defendant's fourth instruction is a little marred in the abstracting, but it is correct in the record.

As it is, in the record, we do not think it liable to appellant's criticism. Appellee's sixth instruction is inaccurate. It is as follows :

" 6. The jury are instructed, that, under the receipts offered in evidence, the plaintiffs cannot recover any other grain than that specified in and actually represented by the receipts at the time they were severally issued. If the jury believe, from the evidence, that the Richardsons were, at the time said receipts were issued, engaged in the business of buying and shipping grain, through an elevator, or warehouse, at Streator, and continued in such after said receipts were issued, and in the course of such business, the grain represented by said receipts at the time they were issued, was shipped from the elevator, and other grain taken in; and that the business was so carried on with the knowledge, and without objection on the part of the plaintiffs, then the plaintiffs are not, by virtue of said receipts, as against the defendant, entitled to recover any grain replevied in this case, which was taken into said Streator warehouse since the issuing of said receipts."

When the relations are such as existed between appellants and Richardson & Son, we perceive no objection to the sale by the latter to the former of grain in store, by giving a warehouse receipt like those introduced in evidence as a *quasi* bill of sale, if the amount does not exceed that of their own grain in the warehouse, and if part of the receipts are surrendered and grain to the amount mentioned in them·is shipped to appellants, and the receipts remaining represent the quantity not shipped, though not actually the last issued. We think the

delivery of the remaining grain in exchange for the remaining receipts, would pass the title to such remaining grain to appellants as against the execution, if actually delivered before the execution went into the hands of the officer.

There may be errors in relation to the exclusion and admission of evidence, which we have not mentioned.

For the errors aforesaid, we think another jury should pass upon the case, and therefore the judgment is reversed and the cause remanded.

Reversed and remanded.